# Order

**Michigan Supreme Court**
**Lansing, Michigan**

September 11, 2020

159205

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

CALEB GRIFFIN,
             Plaintiff-Appellant,

v

SWARTZ AMBULANCE SERVICE,
             Defendant-Appellee,

and

SARAH ELIZABETH AURAND,
             Defendant.

SC: 159205
COA: 340480
Genesee CC: 14-103977-NI

_____/

On April 22, 2020, the Court heard oral argument on the application for leave to appeal the November 29, 2018 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

ZAHRA, J. (*dissenting*).

I respectfully dissent from the order denying plaintiff's application for leave to appeal in this case. Plaintiff was involved in an automobile accident in which he sustained a leg injury. An ambulance unit operating under defendant Swartz Ambulance Service's control responded to the accident, and began transporting plaintiff to the hospital. While en route, the ambulance carrying plaintiff collided with a vehicle owned by a third party, Sarah Aurand. A second ambulance unit arrived at the scene of this accident, and it transported plaintiff to the hospital. Plaintiff filed suit against defendant[1] alleging, in part, that defendant's employee, Mary Shifter—a licensed emergency medical technician (EMT) and the driver of the ambulance that collided with Aurand's vehicle—was negligent in causing the second accident. Plaintiff also claimed that, as a result of Shifter's negligence, treatment of plaintiff's injury from the first accident was delayed and, as a result, a portion of his leg needed to be amputated.

Defendant moved for summary disposition, arguing that it was immune from liability under MCL 333.20965(1), which provides immunity for certain entities

---

[1] Plaintiff initially sued both defendant *and* Aurand, although plaintiff voluntarily dismissed the claims concerning Aurand. Thus, the instant appeal concerns only those claims asserted against defendant Swartz Ambulance Service, which will be referred to as "defendant."

(including EMTs and ambulance operations) for "acts or omissions" that occur "in the treatment of a patient" and that do not amount to "gross negligence or willful misconduct." In response, plaintiff contended that MCL 333.20965(1) does not apply to these circumstances because the second accident occurred during *transportation* and not while plaintiff was receiving any kind of medical *treatment*. The trial court agreed with defendant and granted summary disposition in July 2016. Plaintiff appealed as of right in the Court of Appeals, which affirmed in an unpublished per curiam opinion over Judge MICHAEL J. KELLY'S dissent.[2]

Plaintiff now seeks leave to appeal in this Court, maintaining that MCL 333.20965(1) does not apply because the second accident occurred during patient transportation, as distinguished from treatment of a patient. I am persuaded that the plain language of the emergency medical services act (EMSA)[3]—under which MCL 333.20965(1) falls—supports plaintiff's position.

This Court reviews a trial court's determination on a motion for summary disposition de novo.[4] Likewise, issues of statutory interpretation are questions of law that are reviewed de novo.[5] As the Court previously stated in *Krohn v Home-Owners Ins Co*:[6]

> The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language. The first step in that determination is to review the language of the statute itself. Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.

Statutes should be interpreted in such a way as to avoid rendering any portion of them "surplusage or nugatory."[7] If a statute is unambiguously written, judicial construction is

---

[2] *Griffin v Swartz Ambulance Serv*, unpublished per curiam opinion of the Court of Appeals, issued November 29, 2018 (Docket No. 340480). The Court of Appeals panel majority also denied reconsideration, although Judge M. J. KELLY would have granted plaintiff's motion. *Griffin v Swartz Ambulance Serv*, unpublished order of the Court of Appeals, entered January 22, 2019 (Docket No. 340480).

[3] MCL 333.20901 *et seq.*

[4] *Maiden v Rozwood*, 461 Mich 109, 119 (1999).

[5] *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515 (2012).

[6] *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156-157 (2011) (quotation marks and citations omitted).

[7] *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146 (2002), citing *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60 (2001).

not required or even permitted.[8] "[A] provision of the law is ambiguous only if it irreconcilably conflict[s] with another provision, or when it is equally susceptible to more than a single meaning."[9] As this Court explained in *People v Feezel*:[10]

> When a statute is ambiguous, judicial construction is appropriate to determine the statute's meaning. When determining the Legislature's intent, the statutory language is given the reasonable construction that best accomplishes the purpose of the statute. Indeed, [i]t is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature. As a result, the entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole.

The critical question presented in this case is whether the word "treatment" in the phrase "in the treatment of a patient" as used in MCL 333.20965(1) includes transportation—the act of driving a patient to a hospital in an ambulance. For reference, MCL 333.20965(1) reads, in pertinent part:

> Unless an act or omission is the result of gross negligence or willful misconduct, the acts or omissions of . . . [an] emergency medical technician . . . do not impose liability in the treatment of a patient on [the emergency medical technician] or any of the following persons:[11]
>
> * * *
>
> (d) The life support agency or an officer, member of the staff, or other employee of the life support agency.

---

[8] *People v Gardner*, 482 Mich 41, 50 (2008).

[9] *Id*. at 50 n 12 (quotation marks and citation omitted).

[10] *People v Feezel*, 486 Mich 184, 205; 783 NW2d 67 (2010) (quotation marks and citations omitted; alteration in original).

[11] "Person," in this context, means "a person as defined in [MCL 333.1106] or a governmental entity other than an agency of the United States." MCL 333.20908(7). Under MCL 333.1106(4), a "person" is "an individual, partnership, cooperative, association, private corporation, personal representative, receiver, trustee, assignee, or other legal entity. Person does not include a governmental entity unless specifically provided."

The above cited text indicates that EMTs[12] and life support agencies[13]—which, critically, include ambulance operations like defendant[14]—are given immunity under MCL 333.20965(1) for "acts or omissions," other than those that amount to gross negligence or willful misconduct, that occur "in the treatment of a patient." Thus, for purposes of this matter, it may be assumed that defendant is granted *some* level of immunity under the statute. The question is the extent to which that immunity applies.

The Legislature did not define the term "treatment" in the EMSA, nor did it provide a definition of the term applicable more generally to the Public Health Code as a whole or to Article 17 of the Public Health Code, which contains the EMSA. Undefined statutory terms may sometimes be given meaning via reference to appropriate dictionary sources.[15] But as the diametrically opposed opinions of the Court of Appeals panel majority and dissent make clear below, the use of lay dictionaries on this subject is not helpful, as some support the notion that "treatment," in this context, includes "transportation," while others support the opposite conclusion.

Regardless, the text of the EMSA offers critical clues to suggest that the transport of a patient is not included in the scope of "treatment" as contemplated by MCL 333.20965(1). Multiple times in the EMSA, the act uses the words "treatment" and "transport" in close conjunction, yet clearly denoting *separate and distinct* concepts.

An "ambulance operation," as defined by MCL 333.20902(5), "means a person licensed under this part to provide *emergency medical services and patient transport*, for profit or otherwise."[16] "Emergency medical services" are defined under MCL 333.20904(4) as "the emergency medical services personnel, ambulances, nontransport prehospital life support vehicles, aircraft transport vehicles, medical first response vehicles, *and equipment required for transport or treatment of an individual* requiring medical first response life support, basic life support, limited advanced life support, or advanced life support."[17] In this way, the EMSA uses the word "treatment" and then,

---

[12] Under MCL 333.20904(7), an " '[e]mergency medical technician' [is] an individual who is licensed by the department to provide basic life support."

[13] A " '[l]ife support agency' [is] *an ambulance operation*, nontransport prehospital life support operation, aircraft transport operation, or medical first response service." MCL 333.20906(1) (emphasis added).

[14] An " '[a]mbulance operation' [is] a person licensed . . . to provide emergency medical services and patient transport, for profit or otherwise." MCL 333.20902(5).

[15] *Brackett v Focus Hope, Inc*, 482 Mich 269, 276 (2008). See also MCR 8.3a.

[16] Emphasis added.

[17] Emphasis added.

*separately*, uses the word "transport" to describe different functions of equipment used to provide varying degrees of life support. Thus, as far as "emergency medical services" under MCL 333.20902(5) are concerned, "treatment" is not synonymous with "transport"—even if neither term is defined by statute. Turning back to the statutory definition provided for "ambulance operations," one should note that "emergency medical services"—which includes the equipment *used for* treatment and transport of individuals—is separate from "patient transport."

Further, MCL 333.20969 reads, in full:

> This part and the rules promulgated under this part do not authorize medical treatment[18] for or transportation to a hospital of an individual who objects to the *treatment or transportation*. However, if emergency medical services personnel, exercising professional judgment, determine that the individual's condition makes the individual incapable of competently objecting to *treatment or transportation*, emergency medical services may provide *treatment or transportation* despite the individual's objection unless the objection is expressly based on the individual's religious beliefs.[19]

As the emphasized text demonstrates, the Legislature differentiated between "treatment" and "transportation" multiple times in this single provision of the EMSA. That is, this statute suggests that "emergency medical services," which include "ambulances,"[20] can be used in certain circumstances for either "treatment *or* transportation."[21]

Defendant and amici curiae in support of its position point out that transportation is among the critical functions of an ambulance and an ambulance operation. From this, they reason that transportation must be an inherent component of "treatment." But the very text of the EMSA indicates that transportation is not *the only* function of ambulances or ambulance operations. An ambulance is defined under MCL 333.20902(4) as "a motor vehicle or rotary aircraft that is primarily used or designated as available to provide

---

[18] Amicus curiae Michigan Defense Trial Counsel, Inc., argues that the use of the word "medical" as a qualifier for "treatment" in this statute indicates that the *unqualified* use of the word "treatment" in MCL 333.20965(1) must refer to acts or omissions that encompass more than plaintiff's narrow interpretation of the term. Even assuming that this is true, it *does not* inherently follow that transportation, specifically, qualifies as "treatment" for purposes of the immunity provision.

[19] Emphasis added.

[20] MCL 333.20904(4).

[21] MCL 333.20969 (emphasis added).

transportation *and basic life support, limited advanced life support, or advanced life support.*"[22]  From the words of the act, it is plain that the degree of life support that can be provided by EMTs (basic life support), EMT specialists (limited advanced life support), and paramedics (advanced life support) exceeds the mere act of transporting a patient to a hospital.[23]  Further, the statutory provisions governing the licensure, powers, and duties of an ambulance operation indicate that ambulance operations not only provide transportation, but also certain degrees of life support (depending on the licensure of the ambulance operation).[24]  If transportation were *the only* function of ambulances and, more importantly, ambulance operations, I would be more inclined to agree that— whatever the definition of "treatment" under MCL 333.20965(1)—by merely including ambulance operations under the list of entities that may benefit from the immunity provision, the Legislature conveyed an intent that transportation of patients be included in that definition.  As discussed, however, because ambulances and ambulance operations do more than provide transportation, this assumption is without merit.

Whatever the term "treatment" encompasses, the Court must bear in mind that it "must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render *any part* of the statute surplusage or nugatory."[25]  If the word "treatment" had been meant to include "transportation," the two would not have been used as separate terms in multiple places throughout the EMSA.[26]  To interpret the word "treatment" to include mere "transportation" for purposes of MCL 333.20965(1) would render the latter term meaningless and redundant in other parts of the EMSA.  As the Court of Appeals has previously stated:

> Identical terms in different provisions of the same act should be construed identically, statutory provisions must be read and interpreted as a whole, and the meaning given to one section [must be] arrived at after due consideration of other sections so as to produce, if possible, an harmonious and consistent enactment as a whole."[27]

On the basis of these firmly established principles of statutory interpretation, I am concerned that the Court of Appeals improperly construed the EMSA.  I would therefore

---

[22] Emphasis added.

[23] See MCL 333.20902(1) and (6); MCL 333.20906(3).

[24] MCL 333.20920; MCL 333.20921.

[25] *State Farm Fire & Cas Co*, 466 Mich at 146, citing *Wickens*, 465 Mich at 60 (emphasis added).

[26] See MCL 333.20902(5); MCL 333.20904(4); MCL 333.20969.

[27] *The Cadle Co v City of Kentwood*, 285 Mich App 240, 249 (2009) (quotations marks and citations omitted; alteration in original).

grant plaintiff's application for leave to appeal to allow this Court the opportunity to explore these aspects of the EMSA, an act important to the jurisprudence of this state.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

I dissent from the denial of leave to appeal. The issue in this case is whether the operation of the ambulance constitutes an act "in the treatment of a patient" as that phrased is used in MCL 333.20965(1). MCL 333.20965(1) states, in relevant part:

> Unless an act or omission is the result of gross negligence or willful misconduct, the acts or omissions of . . . [an] emergency medical technician . . . do not impose liability in the treatment of a patient on [the emergency medical technician] or any of the following persons:
>
> *   *   *
>
> (d) The life support agency or an officer, member of the staff, or other employee of the life support agency.

I would grant leave to consider whether the term "treatment" is ambiguous.

As Justice ZAHRA recounts, various provisions of the emergency medical services act (the EMSA), MCL 333.20901 *et seq.*, use "transport" and "treatment" separately.[28] This indicates that the terms have two separate meanings, and that "treatment" does not include "transport." As Justice ZAHRA explains, "If the word 'treatment' had been meant to include 'transportation,' the two would not have been used as separate terms in multiple places throughout the EMSA."[29]

___

[28] Justice ZAHRA discusses MCL 333.20902(5), MCL 333.20904(4), and MCL 333.20969. I would also add MCL 333.20925, which states, in relevant part:

> This part does not prohibit an ambulance from providing emergency transport of a police dog that is injured in the line of duty to a veterinary clinic or similar facility, if the police dog is in need of emergency medical treatment and there are no individuals who require transport or emergency assistance at that time. Ambulance personnel may require that a police officer accompany the police dog during the emergency transport.

[29] *Ante* at 6.

But the dictionary definition used by the Court of Appeals majority and, in my view, even the definition cited by the dissent, appear to indicate that "treatment" does include "transport." The Court of Appeals majority cited *Merriam-Webster's Collegiate* Dictionary (11th ed), which defines "treatment," in relevant part, as "the act or manner or an instance of treating someone or something" and "the techniques or actions customarily applied in a specified situation . . . ."[30] Applying this definition, the Court of Appeals majority determined that treatment was not "limited to actual medical services . . . but . . . includ[ed] activities by first responders acting within the scope of their duties and training as first responders."[31]

I would add that *Merriam-Webster's Collegiate Dictionary* (11th ed), also defines "treat," in relevant part, as "to care for or deal with medically or surgically . . . ." Therefore, "treatment" in the medical context is "the act . . . of "car[ing] for" someone "or deal[ing] with [someone] medically or surgically . . . ." In this context, "deal" means "to take action with respect to someone . . . ."[32] Transporting someone to the hospital is "tak[ing] action with respect to someone" medically.

The Court of Appeals dissent disagreed, quoting the *Oxford English Dictionary* (2d ed), which defines "treatment" as " '[m]anagement in the application of remedies; medical or surgical application or service.' "[33] Based on this definition, the dissent reasoned that "under the plain language of the statute if an individual's acts or omissions are undertaken in the management of the application of remedies or in medical or surgical application, then they would constitute 'treatment.' "[34] Because the ambulance driver "was not undertaking any action to manage plaintiff's injuries" but "was merely transporting him to the hospital while the paramedic in the patient-compartment . . . provided treatment," the ambulance driver was not engaging in "treatment."[35]

---

[30] *Griffin v Swartz Ambulance Serv*, unpublished per curiam opinion of the Court of Appeals, issued November, 29, 2018 (Docket No. 340480), p 4.

[31] *Id*.

[32] *Merriam-Webster's Collegiate Dictionary* (11th ed).

[33] *Griffin*, unpub op at 2 (M. J. KELLY, P.J., dissenting), quoting *Oxford English Dictionary* (2d ed).

[34] *Griffin*, unpub op at 2 (M. J. KELLY, P.J., dissenting).

[35] *Id*.

However, I think that even under the dissent's definition, treatment could be found to encompass transportation. As stated, the *Oxford English Dictionary* defines "treatment" as "[m]anagement in the application of remedies; medical or surgical application or service." Though the ambulance driver was not applying remedies at the moment the accident occurred, it appears she was "[m]anag[ing] . . . the application of remedies[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed) defines "management," in relevant part, as "1: the act or art of managing: the conducting or supervising of something (as a business) . . . ." Relatedly, "manage" is defined, in relevant part, as "to handle or direct with a degree of skill: as . . . b: to treat with care . . . c: to exercise executive, administrative, and supervisory direction of . . . ."[36] By transporting plaintiff to a hospital where he could get care, the ambulance driver appeared to be "managing," i.e., "handl[ing] or direct[ing]," or "exercis[ing] executive . . . direction of," the application of remedies.

Thus, the dictionary definitions seem to indicate that "treatment" does include "transportation." But the statutory provisions surrounding MCL 333.20965(1) indicate that "treatment" does not include "transportation." Whether this potential conflict renders "treatment" ambiguous is a difficult question, and I would have granted leave to decide it.

In determining whether "treatment" is ambiguous, I would also review the proper threshold for ambiguity, namely by reconsidering whether our Court's caselaw stating that "a provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision, or when it is *equally* susceptible to more than a single meaning," is too stringent.[37] As then Judge Kavanagh explained:

> Unfortunately, there is often no good or predictable way for judges to determine whether statutory text contains "enough" ambiguity to cross the line . . . . In my experience, judges will often go back and forth arguing over this point. One judge will say that the statute is clear, and that should be the end of it. The other judge will respond that the text is ambiguous, meaning that one or another canon of construction should be employed to decide the case. Neither judge can convince the other. That's because there is no right answer.

> It turns out that there are at least two separate problems facing those disagreeing judges.

---

[36] *Merriam-Webster's Collegiate Dictionary* (11th ed).

[37] *Mayor of City of Lansing v Pub Serv Comm*, 470 Mich 154, 166 (2004) (citations omitted; alteration in original).

First, judges must decide how much clarity is needed to call a statute clear. If the statute is 60-40 in one direction, is that enough to call it clear? How about 80-20? Who knows?

Second, let's imagine that we could agree on an 80-20 clarity threshold. In other words, suppose that judges may call a text "clear" only if it is 80-20 or more clear in one direction. Even if we say that 80-20 is the necessary level of clear, how do we then apply that 80-20 formula to particular statutory text? Again, who knows? Determining the level of ambiguity in a given piece of statutory language is often not possible in any rational way. One judge's clarity is another judge's ambiguity. It is difficult for judges (or anyone else) to perform that kind of task in a neutral, impartial, and predictable fashion.[38]

---

[38] Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv L Rev 2118, 2136-2137 (2016) (citation omitted). Other commentators have also written about the problems with defining and identifying ambiguity. See, e.g., Farnsworth, Guzior & Malani, *Ambiguity About Ambiguity: An Empirical Inquiry Into Legal Interpretation*, 2 J Legal Analysis 257, 258-259 (2010) ("First, our concern is . . . with what ambiguity *is*; for the word itself is ambiguous. To say that a statute is ambiguous could be a claim that ordinary readers of English would disagree about its meaning, which we will call an external judgment. Or it could be a private conclusion that, regardless of what others might think, the reader is unsure how best to read the text—which we will call an internal judgment. This ambiguity about ambiguity is latent; courts generally talk about whether a statute is ambiguous without making clear whether they are making internal or external judgments."); Slocum, *The Importance of Being Ambiguous: Substantive Canons, Stare Decisis, and the Central Role of Ambiguity Determinations in the Administrative State*, 69 Md L Rev 791, 799-800 (2010) ("Despite the seemingly straightforward nature of the ambiguity definition, courts have struggled to adapt it to legal usage. Consider the hodgepodge of differing, and generally unhelpful, standards courts have used for describing statutory ambiguity. Often these definitions are circular, declaring that a statute is ambiguous merely if it is unclear. Other definitions focus on the interpreter rather than the text.") (citations omitted); Solan, *Pernicious Ambiguity in Contracts and Statutes*, 79 Chi-Kent L Rev 859, 859-860 (2004) ("The problem, perhaps ironically, is that the concept of ambiguity is itself perniciously ambiguous. People do not always use the term in the same way, and the differences often appear to go unnoticed. While all agree that ambiguity occurs when language is reasonably susceptible to different interpretations, people seem to differ with respect to whether those interpretations have to be available to a single person, or whether ambiguity occurs when different speakers of the language do not understand a particular passage the same way. In addition, line drawing problems lead to disagreement about what interpretations are reasonable.").

Moreover, I would also consider whether certain interpretive tools may be used only after a finding of ambiguity, if at all.[39] Specifically, though this Court has permitted consideration of legislative history after a finding of ambiguity,[40] I would question whether the Court should turn to legislative history even after such a finding because of

---

[39] This Court has said that judicial construction is only appropriate with a finding of ambiguity. *In re MCI Telecom Complaint*, 460 Mich 396, 411 (1999) ("If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible. Should a statute be ambiguous on its face, however, so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning.") (citation omitted). For example, this Court has allowed the use of preferential rules of interpretation only after a finding of ambiguity. *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 319 (2002) ("We do not apply preferential rules of statutory interpretation, however, without first discovering an ambiguity and attempting to discern the legislative intent underlying the ambiguous words."). It is worth noting that the Court has recently declined to employ certain preferential rules, see *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 553 n 18 (2016), a trend with which I agree, see *Schaub v Seyler*, 504 Mich 987, 991 (2019). Moreover, some prominent commentators suggest that ambiguity can always be resolved after applying the normal tools of interpretation. Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 233 ("So in our view a contractual provision that all ambiguities will be resolved in favor of one of the parties is ineffective—or, perhaps, effective only when, after applying all the normal tools of interpretation, an ambiguity cannot be resolved (which is never).").

[40] *Luttrell v Dep't of Corrections*, 421 Mich 93, 103 (1984) ("Where ambiguity exists in a statute, a court may refer to the history of the legislation in order to determine the underlying intent of the Legislature.").

the many problems with reliance on legislative history.[41]  Because I would grant leave to consider these issues, I dissent from the Court's denial order.

---

[41] See, e.g., *Reading Law*, p 375 ("[T]he use of legislative history poses a major theoretical problem: It assumes that what we are looking for is the intent of the legislature rather than the meaning of the statutory text."); *id*. at 376 ("A reliance on legislative history also assumes that the legislature even *had* a view on the matter at issue.  This is pure fantasy.  In the ordinary case, most legislators could not possibly have focused on the narrow point before the court."); *id*. ("Further, the use of legislative history to find 'purpose' in a statute is a legal fiction that provides great potential for manipulation and distortion."); *id*. at 377 ("Legislative history creates mischief both coming and going— not only when it is made but also when it is used.  With major legislation, the legislative history has something for everyone . . . .  Moreover, because there are no rules about which categories of statements are entitled to how much weight, the history can be either hewed to as determinative or disregarded as inconsequential . . . ."); *id*. at 386 ("The use of legislative history also spawns a separation-of-powers problem: It entrusts the legislature (or more precisely, some legislators) with the interpretation of provisions that it has enacted—a function that is the preeminent and exclusive responsibility of the courts."); *id*. at 388 ("[U]se of legislative history is not just wrong; it violates constitutional requirements of nondelegability, bicameralism, presidential participation, and the supremacy of judicial interpretation in deciding the cases presented.").



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

September 11, 2020



Clerk

s0909